FILED

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
WESTERN DIVISION

00 AUG 29  AM 11: 50

U.S. DISTRICT COURT
N.D. OF ALABAMA

| | |
|---|---|
| ANITA DOWLING, et al., )<br><br>Plaintiffs, )<br><br>vs. )<br><br>THE BOARD OF TRUSTEES OF THE )<br>UNIVERSITY OF ALABAMA, et al., )<br><br>Defendants. ) | CV 91-BU-2542-W |

ENTERED

AUG 29 2000

| | |
|---|---|
| ROBIN LAMBERT, )<br><br>Plaintiff, )<br><br>vs. )<br><br>THE BOARD OF TRUSTEES OF THE )<br>UNIVERSITY OF ALABAMA, et al., )<br><br>Defendants ) | CV 93-BU-0681-W |

## Memorandum Opinion

150

Pending before the Court are (1) a renewed motion for class certification filed by the Plaintiffs, Joyce Pandelis ("Pandelis"), Anita Dowling Bryce ("Bryce"), Paula Dennis ("Dennis"), Lynn Dockery ("Dockery"), Nora Virginia Keene ("Keene"), Patsy Reece ("Reece"), Judi McClendon ("McClendon"), Wiladean Smelser ("Smelser"), Norma Agee ("Agee"), Carmie Carr ("Carr"), Joy Deason ("Deason"), Roslyn Griffin ("Griffin"), and Carolyn Morris ("Morris"), on May 26, 2000 (Doc. 102); (2) a motion for summary judgment by the Board of Trustees of the University of Alabama ("University"), Roger Sayers ("Sayers"), Hubert Kessler ("Kessler"), Robert A Wright ("Wright"), Coy B. Wood ("Wood"), Kay Staub ("Staub"), Roy Smith ("Smith"), Malcolm McDonald ("McDonald"), Bernard J. Sloan ("Sloan"), and Edward Mullins ("Mullins") on all claims against them filed on May 26, 2000 (Doc. No. 97), (3) a motion for summary judgment filed by Smith as to all claims of Morris filed on May 26, 2000 (Docs. No. 100 & 105), (4) a motion for summary judgment filed by Smith as to all claims of Deason filed on May 26, 2000 (Doc. No. 103), (5) a motion for summary judgment filed by Smith as to all claims of Griffin filed on May 26, 2000 (Doc. No. 109), (6) a motion for summary judgment filed by Smith as to all claims of Keene filed on May 26, 2000 (Doc. No. 112), (7) a motion for summary judgment filed by Smith as to all claims of Carr filed on May 26, 2000 (Doc. No. 116), and (8) a motion to strike the declaration of Chester I. Palmer ("Palmer") in Defendants' evidentiary submissions in opposition to Plaintiffs' motion for class certification filed by the Plaintiffs on July 7, 2000 (Doc. No. 143).

On June 14, 2000, the Court entered an order granting in part a motion for denial of summary judgment filed by the Plaintiffs pursuant to Federal Rule of Civil Procedure 56(f) on the grounds that more discovery was in order on a number of fact-intensive issues in the action. After removing the highly fact-laden matters from consideration, the Court outlined the issues remaining for summary judgment:

A.  Defendants' arguments that certain claims against the University of Alabama are barred by Eleventh Amendment sovereign immunity;

B.  Defendants' arguments that certain claims for damages against the individual Defendants in their official capacity are barred by Eleventh Amendment sovereign immunity;

C.  Defendants' arguments that both the University of Alabama and the individual Defendants in their official capacity are not persons within the scope of 42 U.S.C. § 1983;

D.  Defendants' arguments that the Plaintiffs' constitutional claims brought pursuant to 42 U.S.C. § 1983 fail as a matter of law because the Plaintiffs are unable to demonstrate that they have suffered a "constitutional injury" — that is, they were not deprived of a life, liberty or property interest;

E.  Defendants' arguments that the Plaintiffs' claims against the individual Defendants in their individual capacities under Title VII of the Civil Rights Act of 1964 and under the Equal Pay Act fail because the individual defendants are not their "employers" within the meaning of either statute;

F.  Defendants' arguments that the following Title VII claims are barred because they were brought more than 180 days after the alleged discrimination (or not at all) and the claims are not entitled to piggyback on the charge of another employee:

1.  All claims of discrimination by Pandelis;

2.  All claims of discrimination by Deason;

3.  Claims of Keene arising from her employment in the Records Office;

4.  Claims of Dennis arising (1) from denial of an Art Director position in University Relations; (2) from denial of a Graphics position in Continuing Studies; (3) from denial of Production Manager's position in the University Press; and (4) from failure of the University of Alabama to reclassify her position from non-exempt OCT to exempt professional;

5.    All claims of Agee;

6.    All claims of Griffin;

7.    Claims of Reece related (1) to her employment in University Television Services and (2) to sexual harassment occurring in the Philosophy Department;

8.    All claims of Carr;

9.    Claims of Morris based (1) on her Hay Point Evaluation and (2) on salary discrimination;

10.    All claims of Dockery;

11.    Claim of McClendon arising out of denial of Expanded position given to Jim Rowell;

12.    Claims of Smelser related (1) to her Hay Point Evaluation and (2) to Rowell's 1988 promotion;

13.    Claims of Bryce related (1) to Rowell's 1988 promotion and (2) to her 1996 discharge; and

14.    All claims of Lambert.

G.    Defendants' arguments that the following claims brought pursuant to § 1983 are time-barred by the statute of limitations:

1.    All claims of Deason;

2.    Claims of Keene arising from her employment in the Records Office;

3.    Claims of Dennis arising (1) from denial of an Art Director position in University Relations; (2) from denial of a Graphics position in Continuing Studies; (3) from denial of Production Manager's position in the University Press; and (4) from failure of the University of Alabama to reclassify her position from non-exempt OCT to exempt professional;

4.    All claims of Agee;

5.    All claims of Griffin;

6.    Claim of Reece related to her employment in University Television Services;

7.    Claims of Morris based (1) on her Hay Point Evaluation and (2) on salary discrimination;

8.   Claim of McClendon arising out of denial of Expanded position given to Jim Rowell;

9.   Claims of Willodean Smelser related (1) to her Hay Point Evaluation and (2) to Rowell's 1988 promotion;

10.  Claims of Bryce related (1) to Rowell's 1988 promotion and (2) to her 1996 discharge; and

11.  All claims of Robin Lambert.

H.   And, Defendants' arguments that the following claims made pursuant to the Equal Pay Act are untimely:

1.   All claims of Deason;

2.   Claims of Keene arising from her employment in the Records Office;

3.   All claims of Agee;

4.   All claims of Griffin; and

5.   Claim of Reece related to her employment in University Television Services.

Because resolution of the matters before the Court on summary judgment have potential impact on the matter of class certification, the Court gives the summary judgment issues priority of place in the present memorandum opinion. These resolved, the Court will turn to the class certification matter.

## Summary Judgment

Summary judgment avails the parties of an invaluable opportunity to test the mettle of a case before it ever reaches trial. In evaluating a motion for summary judgment, the court assesses all of the proof the parties can bring to bear to ascertain the presence of a genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Under Federal Rule of Civil Procedure 56, the court's determination of the propriety of summary judgment is to be tempered by a strong inclination in favor

of the non-movant. Therefore, only if the court concludes that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of law is a grant of summary judgment appropriate. FED. R. CIV. P. 56(c). *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

It is the initial responsibility of the movant to inform this court of the grounds for its motion and to specifically identify those portions of the pleadings, depositions, answers to interrogatories, admissions on file, and any affidavits that it believes demonstrate the absence of a genuine issue of material fact. *Id.* at 323. The movant carries no meager burden, for it must illuminate for the district court, with reference to materials on file, the reasons why the non-movant cannot or does not raise a genuine issue of material fact sufficient to support a trial. *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991). *But see Gonzalez v. Lee County Housing Authority*, 161 F.3d 1290, 1294 (11th Cir. 1998) ("When the non-moving party bears the burden of proof on an issue at trial, the moving party need not 'support its motion with affidavits or other similar material negating the opponent's claim,' [*Celotex*] at 323 [], in order to discharge this initial responsibility. Instead, the moving party simply may "'show[ ]" — that is, point[ ] out to the district court — that there is an absence of evidence to support the nonmoving party's case.'").

Only after the moving party has satisfied this initial burden must the nonmoving party "make a sufficient showing to establish the existence of each essential element to that party's case, and on which that party will bear the burden of proof at trial." *Howard v. BP Oil Company*, 32 F.3d 520, 523 (11th Cir. 1994). At that point, Federal Rule of Civil Procedure 56(e) dictates that the nonmoving party "go beyond the pleadings" and by "affidavits, or by the 'depositions, answers to interrogatories, and admissions on file' designate 'specific facts'" showing there exist genuine issues for trial. *Celotex*, 477 U.S. at 324; *Cottle v. Storer Communication, Inc.*, 849 F.2d 570, 575 (11th Cir. 1988). "If the

non-moving party fails to 'make a sufficient showing on an essential element of her case with respect to which she has the burden of proof,' then the court must enter summary judgment for the moving party." *Gonzalez v. Lee County Housing Authority*, 161 F.3d at 1294 (11th Cir. 1998). Bare speculation based on loose construal of the evidence will not satisfy the non-movant's burden. *See id.*

While the district court is permitted to consider the offered "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any" in deciding whether to grant or deny a summary judgment motion, FED. R. CIV. P. 56(c),the non-movant bears the absolute responsibility of designating the specific facts in the record that support its claims. *See United States v. Four Parcels of Real Property in Greene and Tuscaloosa Counties in the State of Alabama*, 941 F.2d 1428, 1438 (11th Cir. 1991); *Jones v. Sheehan, Young & Culp, P.C.*, 82 F.3d 1334, 1338 (5th Cir. 1996). In other words, Federal Rule of Civil Procedure 56 "does not impose upon the district court a duty to survey the entire record in search of evidence to support a non-movant's opposition." *Id. See also Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir.) ("There is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment."), *cert. denied*, — U.S. —, 116 S.Ct. 74 (1995).

In resolving whether a given factual dispute requires submission to a jury, the court must inspect the presented evidence through the looking glass of each party's substantive evidentiary burden. *Anderson*, 477 U.S. at 254-55. Nonetheless, the court must abstain from examining the probity of conflicting evidence and from deciding issues of credibility. *Welch v. Celotex Corp.*, 951 F.2d 1235, 1237 (11th Cir. 1992). "It is not part of the court's function, when deciding a motion for summary judgment, to decide issues of material fact, but rather decide whether such issues exist to be tried. The Court must avoid weighing conflicting evidence or making credibility determinations." *Hairston v.*

*Gainesville Sun Publishing Co.*, 9 F.3d 913, 919 (11th Cir. 1993). Still though, "[t]he nonmoving party must provide more than a mere scintilla of evidence to survive a motion for judgment as a matter of law; 'there must be a substantial conflict in evidence to support a jury question.'" *Tidwell v. Carter Products*, 135 F.3d 1422, 1425 (11th Cir. 1998) (*citing Carter v. City of Miami*, 870 F.2d 578, 581 (11th Cir.1989)). Further, district courts have been advised to review motions for summary judgment in employment discrimination cases with exacting scrutiny to "police the baseline" of such claims. *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1244 (11th Cir. 1999) (en banc), *cert. denied*, — U.S. —, 120 S.Ct. 1674 (2000).

## Facts[1]

Given the range and variety of claims brought by the Plaintiffs, an account of the facts pertinent to those claims can quickly become intractably mired in confusion. To avoid this problem, the Court will divide its analysis of the relevant facts into two portions, one presenting the general assertions and allegations in the action and another describing the relevant specifics of the claims of each individual Plaintiff.

---

[1] The facts as detailed in this memorandum opinion are based upon the evidence presented to the Court as read in the light most favorable to the Plaintiffs and with all reasonable inferences made in the Plaintiffs' favor. The facts as they develop at trial may be entirely different.

I. GENERAL ALLEGATIONS.

The Plaintiffs' action in this case targets a large swathe of allegedly discriminatory conduct perpetrated by the University through its various employees and Trustees under a set of employee classification systems put in place in the late 1960's and mid-1970's. According to the Plaintiffs, discrimination occurred both within and between two of three employee classification systems of the University, the Office-Clerical-Technical system (the "OCT system") and the Administrative-Professional system (the "AP system"), governing the pay scale of non-faculty employee positions at the University. The third pay system, less at issue in the present action, is the predominantly male Maintenance-Service system (the "MS system").  The OCT system was inherently discriminatory, argue the Plaintiffs, because within the system, the highest-ranking and highest paid positions were exclusively male, while women, who filled a substantial majority of the OCT system's ranks, were classified in lower-ranking, and consequently lower-paid, positions.  It was also comparatively discriminatory, in that women classified in the OCT system received lower salary and benefits than similarly situated employees classified under the AP system, who are more likely to be male.  The Plaintiffs argue that the AP system was inherently discriminatory because the positions held by women in the AP system were generally lower paying and lower ranked than those held by similarly situated males, despite relatively equal gender diversity in the AP system as a whole.

## A. Inherent discrimination within the OCT system.

The Plaintiffs aver that, prior to 1969, job positions and salaries for women were meted out by department supervisors and department heads of the University on a subjective basis.  Without objective factors or categories guiding the process through which the salaries of occupational and clerical workers were set, the duties and pay assigned to similar positions varied, based largely on the discretion of each department.

In 1969, the University set up the OCT system, separating it from the MS system also then-created and filling its ranks largely with the occupational and technical positions, "traditionally female jobs" afforded low benefits and pay. According to the Plaintiffs, employees within the OCT system are internally ranked based upon allegedly subjective criteria. Ostensibly, allege the Plaintiffs, the office of compensation and classification creates and maintains a neutral list of jobs with various duties affiliated with those positions and it assigns to those positions differing pay grades. When an employee is classified (or reclassified) into a position within the OCT system, a department submits, through the appropriate vice-president's office, to the office of compensation and classification a position questionnaire setting forth the duties and responsibilities of the position. The office of compensation and classification then compares the assigned duties and responsibilities to those of jobs listed. If there is a match with a listed job, the classification of the listed job determines the appropriate pay grade. Where there exists no clear match for the duties and responsibilities of the position, the level of the duties and responsibilities is compared to the level of duties and responsibilities of other listed jobs. The position is then graded and added to the list of classified jobs.

Salaries within the OCT system are determined by the various department heads within the University, once a position pay grade is determined. Within a pay grade, there exist minimum and maximum amounts that an employee can be paid; while newly-hired employees starting in a position must be appointed at the minimum pay amount, the number and amount of pay increases that an employee in the OCT system can expect to receive is determined by a department head, with approval from the department head's supervisor. If an employee accrues sufficient additional duties in her or his position, she or he may be reclassified within the OCT system (or within the AP system if the position takes on an administrative or professional character), thereby receiving increased pay and benefits.

In their briefs, the Plaintiffs seem to highlight several alleged problems with the OCT system. First, Plaintiffs claim that among the various positions classified in the OCT system there are often minor responsibility differences that have tremendous effects in pay grade and that whether those responsibilities are being performed is often determined on a subjective basis. Although both do essentially the same work and women significantly outnumber men in the OCT system, male employees are regularly placed in higher pay grade classifications than female employees, because job placement within the position classifications is comparative. According to the Plaintiffs, the comparative nature of the position classification process permits gender-biased subjectivity to intrude on that process. In addition, while women outnumber men in the OCT system, they are clustered in the lower range of positions. In 1990, 83 of the 270 positions held by males in the OCT system (or approximately 31% of the positions held by male employees in the OCT system) were congregated in the top five pay grades in the system; only 19 of the 1234 positions held by female employees in the OCT system (or approximately 2% of the positions held by female employees in the OCT system) lay in the top five pay grades. While forty-eight men held positions in the top three pay grades, no women held positions in those top three grades. Further, the Plaintiffs apparently allege, within the pay grades, women were paid wages lower than those paid to men. The Plaintiffs, however, present no evidence regarding the relevant job applicant pool for the various types of positions or the variance in male-to-female ratio among OCT employees to that ratio in the relevant geographic market of qualified applicants.

**B. Comparative discrimination between the OCT system and the AP system.**

The Plaintiffs allege that many of the positions existing in the OCT system have counterparts in the AP system. Employees in those counterpart positions in the AP system purportedly receive better pay and benefits than similarly situated OCT system

employees.  Further, the Plaintiffs contend that there exists a greater chance that an employee in a position in the AP system is male than an employee in a counterpart position in the OCT system is male.  As such, the Plaintiffs allege, women are disproportionately classified as OCT system employees in positions that easily could be classified as AP system positions.  This proportionally denies them opportunities for pay increases and advancement, leaving them at the mercy of the primarily subjective OCT pay grade evaluation system and shutting them out of the more favorable AP pay grade system.

## C. Inherent discrimination within the AP system.

Not only are the full pay and benefits of AP system employees sought by female OCT system employees, female AP system employees seek to have those benefits more equitably distributed among women and men.  According to the Plaintiffs, while discrimination within the AP system is not so marked as the discrimination within the more subjective OCT system, it still exists.  According to the Plaintiffs, women in the AP system receive nearly $2000.00 per year less in salary than their male counterparts occupying the same or similar positions.  This is the case, allege the Plaintiffs, because in 1974, in creating the AP system, the University only partially put into place the Hay point system for allocation of jobs and salaries and the manner in which the Hay point system was introduced caused the perpetuation of discrimination against individuals employed in the AP system.

Under the AP system, various attributes of a position are assigned points and an evaluation of those points determines the salary received by an employee between a minimum and maximum amount.  The Plaintiffs complain that the assignment of these points by supervisors and the like is undertaken in a subjective, discriminatory fashion and that, as a consequence, the Plaintiffs with jobs in the AP system were underpaid.

II. SPECIFIC ALLEGATIONS.

Outside of the University-wide pay discrimination claims, the Plaintiffs complain of a various assortment of allegedly discriminatory practices, including denials of promotions, terminations, denials and assignments of duties, and assignments of job responsibilities. Because the specific discrimination claims vary among the Plaintiffs, the Court will detail time frames for the relevant claims with regard to each named plaintiff.[2]

## A. Joyce Pandelis.

On December 21, 1985, Pandelis was offered a job as Assistant to the Dean of New College at the University of Alabama, a position advertised as a five-year, administrative, non-tenure-earning position within the University's AP system. Pandelis accepted the position on January 8, 1986, and began work on February 1, 1986. Within her first year as an administrator at the University, Pandelis applied for three other positions within the University of Alabama system, one of which was located at the University of Alabama, Birmingham, an entity not the subject of the instant action. Within her second year, Pandelis applied for two other positions within the University. Pandelis contends that she would have applied for a position as the Graduate Admissions Coordinator in her fourth year with the University, had such been posted, rather than surreptitiously given to another male candidate.

According to Pandelis in late February or early March of 1990, she had a conversation with Sloan, the Dean of New College, in which he allegedly indicated that her five-year term would soon end, but that if she needed more time in which to search for another position, he could extend her employment at the University for an additional

---

[2] The Court has not chosen to provide a detailed rendering of all the facts relevant to the claims of each Plaintiff (to the extent that such are determinable), but only those facts that are pertinent to the present motion.

year. On March 7, 1990, Pandelis received a letter confirming the conversation, which stated, in relevant part:

> Please know that I am available to help you in any way with your job search. You know that you can use me for references, recommendations, phone calls, or in any other way you may find useful. If you need extra time in the pursuit of a job, we will gladly make this available.

Class Certification Exhibit No. 27 at ¶ 7.

Immediately after receiving this letter, Pandelis applied for seven positions within the University. On April 25, 1990, Pandelis received a copy of a letter that Kessler, the Director of Human Resources at the University, wrote on her behalf to the Director of Employment at the University of Alabama at Birmingham, indicating that Pandelis's employment would be ending after a five-year, temporary assignment with the University and enlisting his aid in her search for another position in the University of Alabama system.

On August 7, 1990, Pandelis wrote a letter to Sloan, requesting a one-year extension of her employment while she continued her job search. On August 10, 1990, Sloan responded that her employment would terminate on January 31, 1991, and clarifying his statement in the March 7, 2000, letter that he would provide her with "extra time" for her job pursuit to mean that he would give her additional time away from work for the remainder of her employment if she needed the time for job interviews.

On October 19, 1990, Pandelis signed an EEOC charge, subsequently filed on October 30, 1990. She amended her charge on November 21, 1990. This EEOC charge states, with regard to the alleged discrimination suffered by Pandelis:

> I.  On December 21, 1985[,] I was hired to be the Assistant to the Dean of the New College by the Respondent. My appointment stated that:
>
> > This position is a transitional one with the expectation that whoever holds it will, in three to five years, move

on to greater responsibilities in other areas outside the College.

I satisfactorily performed the duties of my position during the time since I was appointed. I have been evaluated as having performed my duties in an excellent manner. During the period since December 21, 1985[,] and continuing until the present, the Respondent has made no effort to effect my transition to greater responsibilities in other areas of the University. On information and belief, the Respondent's failure or refusal to do anything to effect my transition to greater responsibilities has been because of my sex and conforms to a general pattern and practice of sexual discrimination in hiring, job assignments, promotions, transfers, compensation and other terms and conditions of work.

II. The Respondent's failure or refusal to effect my transition to greater responsibilities is a continuing one and violates the Affirmative Action Plan of the University of Alabama. On information and belief, the Respondent fails and/or intentionally refuses to abide by or implement its Affirmative Action Plan because of my sex and because of the pattern and practice of sexual discrimination set forth above. This failure and/or refusal also has a disparate impact on women as a class.

III. I was informed in a letter dated October 22, 1990[,] from Dean Bernard J. Sloan that my job would terminate[] on January 1, 1991. On information and belief, I believe that my termination is because of my sex and because of the pattern and practice of sexual discrimination which is set forth above.

Plaintiff's Class Certification Exhibit No. 25. Pandelis received her right-to-sue letter from the EEOC on August 2, 1991, and commenced her action against the University on October 29, 1991, in a complaint that alleged only a violation of Title VII of the Civil Rights Act. On January 8, 1992, Pandelis amended her complaint to add two other AP system employees as Plaintiffs and to add state class-wide pay and promotion

discrimination claims against the University under Title VII and 42 U.S.C. § 1983 and Equal Pay Act claims of pay discrimination.   Pandelis also added individual discriminatory treatment and discharge claims under 42 U.S.C. § 1983 and Title VII. Pandelis amended her complaint again on September 17, 1992, adding individual claims against the individual Defendants.[3]

## B. Joy Deason.

Deason was employed during two different periods with the University, both times in the OCT system: She was first employed by the University as a Records Clerk I & II in the Records Office from April 25, 1988 until September 12, 1990.   Deason then returned to employment with the University on February 24, 1992, as a Secretary II in the College of Engineering.   She remained in that job until June 18, 1996.   Deason filed her individual EEOC charge on July 28, 1992.

In her charge of discrimination with the EEOC, Deason made the following largely inspecific allegations:

I.     The Respondents discriminate on the basis of sex in compensation. Among other ways, this is accomplished through the use of a pay setting system which has [a] disparate impact on women and involves disparate treatment in its administration.

II.    The Respondents have also discriminated on the basis of sex in job assignments and job opportunities including, but not limited to, assignment of duties, titles, responsibilities, promotions and awarding of pay increases.

III.   On information and belief, the Respondent discriminates against all women in compensation, job assignments, promotions and other

---

[3] This third amended complaint is of little use to the Court in determining what happened to whom or what claims are stated against which individuals. In short, it is the typical "shotgun" complaint, firing innumerable claims against every Defendant, with the hope that one or two will hit a target.

> terms and conditions of work including, but not limited to the compensation system and evaluation process.

Defendants' Appendix of Exhibits in Support of the Motion for Summary Judgment at 203. Deason became a party to the instant action on September 17, 1992, when the third amended complaint was filed.

### C. Nora Virginia Keene.

Keene last worked for the University on August 9, 1989, as an employee in the University's Records Office. She became a party to this action on September 17, 1992. She did not file an EEOC charge in the present action until July 31, 1992. That charge is identical to the charge filed by Deason.

### D. Paula Dennis.

From June 1, 1987, until October 14, 1994, Dennis worked for the University as a Production Assistant/Designer with the University of Alabama Press, an OCT system position. In June of 1990, the position of production manager became vacant in the University Press office. Dennis applied for the position but failed to obtain the job. Rather, the position was given to Dr. John Zeigler in early July of 1990. After not receiving the position as production manager, Dennis spoke to the director of the University Press, MacDonald, about having her position re-evaluated into an AP system position. In the week beginning September 9, 1990, MacDonald informed Dennis that her job would not be reclassified as an AP system position.

Also in the summer of 1990, a full-time graphics position became available in the University's Continuing Studies department, for which Dennis applied. However, on November 1, 1990, the position was given to Ron Berenado, a male allegedly then serving

in the position part-time.  Finally, Dennis was allegedly denied an Art Director for University Relations position that went to another individual on February 12, 1991.

Dennis did not file her EEOC charge until August 20, 1992, alleging the last discriminatory event to have occurred on July 24, 1992, and to be ongoing.  That charge did not detail the specific events complained of in this action.  Rather, the assertions of discrimination presented by Dennis and Keene in their EEOC charges are identical to those raised by Deason in her EEOC charge.  Dennis did not join the present action until September 17, 1992, with the filing of the third amended complaint.

### E.  Norma Agee.

Agee was employed by the University as a Secretary III in the OCT system until she resigned on August 3, 1990, as a consequence of an involuntary transfer.  Agee never filed an EEOC charge and did not become a party to this action until the Plaintiffs filed their third amended complaint on September 17, 1992.

### F.  Rosalyn Griffin.

Griffin was an employee of the University until her retirement from the position of Admissions Counselor on January 31, 1989.  She alleges that her retirement was, in fact, a constructive discharge from her employment, resulting from sexual harassment. Griffin did not file an EEOC charge and did not become a party to this action until September 17, 1992.

### G.  Patricia Reece.

Reece's claims arise out of two separate periods of employment with the University.  The first period ranges from 1973 until April of 1989, when she moved through the University's ranks from the position of Accounting Clerk II to the Position

of Program Support Assistant in the University Television Services. All of these positions were within the OCT system. Reece claims that, during the first period, she was denied several opportunities for advancement, first in 1983 to a position as an Operations Technician, then in 1988, to a job as a Staff Assistant, and third in 1989, to a position as Director of the University Television Services. She also claims that she was terminated from her position as Program Support Assistant in January of 1990 on the basis of gender discrimination. Finally, she claims that throughout her time as an employee in the University Television Services, she did not receive similar training as other employees and that the University refused to reclassify her as an AP system employee.

Soon after she was terminated from her job in the University Television Services, Reece began her second period of employment with the University in the Philosophy Department as a Secretary in the OCT system. She claims that while working in the Philosophy Department, she was sexually harassed and was underpaid. Reece remained in that job until October 30, 1998.

Reece did not file a charge of discrimination. In addition, she did not join the action until September 17, 1992, when the third amended complaint was filed.

## H. Carmie Carr.

Carr was employed by the University as an Admissions and General Information Assistant, an OCT classified position, from April 4, 1989, until July 5, 1991, when her resignation from work became effective. She claims that she was constructively discharged from her employment, that she was denied a host of employment advancement and training opportunities, and that she was discriminated against in the amount of pay that she received. Carr did not file an EEOC charge and became a party to this action on September 17, 1992, in the third amended complaint.

## I. Carolyn Morris.

Morris worked in the College of Communication as the Registrar, an AP system position, until she retired on January 1, 1992. She claims that she was the subject of gender-based discrimination because she received poorer Hay Point evaluations and less pay than similarly-situated men. On December 16, 1991, Morris filed an EEOC charge alleging discrimination, in which she stated:

I.      The Respondents discriminate on the basis of sex in compensation. Among other ways, this is accomplished through the use of a pay setting system which has [a] disparate impact on women and involves disparate treatment in its administration.

II.     The Respondents have also discriminated on the basis of sex in job assignments and job opportunities including, but not limited to, assignment of duties, titles, responsibilities, promotions and awarding of pay increases.

III.    On information and belief, the Respondent discriminates against all women in compensation, job assignments, promotions and other terms and conditions of work including, but not limited to the compensation system and evaluation process.

IV.     I have been adversely affected by all of the foregoing practices individually and as a member of the class of women who have been discriminated against.

V.      I have also been harassed and subjected to a sexually hostile and abusive work environment because of my sex and because of my opposition to sexual harassment, favoritism and discrimination.

VI.     As a result of my sexually discriminatory treatment and my opposition to such treatment, I was forced to resign my position and was constructively discharged.

Plaintiff's Class Certification Exhibit No. 24.

Morris joined the instant action on January 8, 1992, when the second amended complaint was filed.  In the second amended complaint, Morris did not name any Defendants in their individual capacities.

## J.  Lynn Dockery.

Dockery was originally hired by the University in 1970 as an employee in the OCT system; in June 1989, she sought to have her position reclassified as an AP system Administrative Assistant.  The University denied her the upgrade in January 1990.  She then sought to be upgraded within the OCT system to the position of Media Operations Assistant.  Again, she was denied the upgrade.  Finally, on August 27, 1990, a request for reclassification of Dockery's position was made by her supervisor on her behalf.  This request was also denied.  She claims that males who performed essentially the same work as her were provided higher pay and benefits.

Dockery filed no EEOC charge and did not become a Plaintiff in this action until September 17, 1992, when the third amended complaint was filed.

## K.  Judi McClendon.

In 1981, McClendon was hired by the University as a Benefits Specialist, an AP system position.  She claims that during her time as a Benefits Specialist, she received lower pay than male comparators, she was not given an opportunity to apply for a position as a Staff Training Manager and Personnel Assistant on August 9, 1988, and her job was improperly given a lower Hay Point score than the Hay Point score given to male comparators in 1991.  On February 20, 1992, McClendon filed her EEOC charge, reciting the unspecific litany of discrimination included by Dennis, Keene and Deason.  She became a party to the instant action on September 17, 1992, when the third amended complaint was filed.

### L. Willodean Smelser.

Smelser began her employment with the University in 1969 as a secretary in the personnel office. Through the years, Smelser worked at a variety of positions, eventually becoming an Employment Manager for the University, classified as an AP employee. In addition to her discriminatory pay claims, Smelser presents a claim that she should have been allowed to apply for the position of Staff Training Manager and Personnel Assistant on August 9, 1988 and that she did not receive the appropriate number of Hay points when her AP system job was reevaluated on October 1, 1991.

Smelser filed her EEOC charge on April 14, 1992, reciting the same complaints of discrimination as those described by Dennis, Keene, Deason, and McClendon, as well as a complaint that as "the Employment Manager for the University at the Tuscaloosa Campus[,]" she was "paid less than male employees performing substantially similar duties and responsibilities requiring equal skill, effort and responsibility under similar working conditions." Defendants' Appendix of Exhibits in Support of Summary Judgment at 195. She joined the present action on September 17, 1992, with the filing of the third amended complaint.

### M. Anita Dowling Bryce.

Bryce was hired by the University as a Clerk-Typist III in the Benefits Office, an OCT system position, in June of 1974. She worked her way through the ranks of the University until October of 1981, when she was promoted to the position of Benefits Coordinator, an AP system position. In 1984, Bryce was made Benefits Manager and in September of 1991, she was promoted to the job of Assistant Human Resources Manager for Benefits. She claims that, in this position, she was paid less than other similarly-situated male employees. She also claims to have been constructively discharged from her position by being forced to retire from her job in 1996.

On November 21, 1991, Bryce filed her charge of discrimination with the EEOC. That original charge recites the same language employed in the Dennis, Keene Deason, McClendon and Smelser charges. Bryce joined the present action on January 8, 1992, when Pandelis filed her amended complaint, adding the class-wide pay and promotion claims.

## N.  Robin Lambert.

Lambert was employed as a Coordinator of Rural Education with the University in 1983. In 1992, the position was made permanent. In April of 1993, Lambert held the position of Assistant Director of the Program for Rural Services and Research. Lambert filed no EEOC charge. She filed her action on April 9, 1993 and her action was consolidated with that of the other Plaintiffs on October 19, 1993. Lambert has largely raised the same broad and unspecific panoply of claims presented by many of her co-plaintiffs.

## Contentions & Analysis

In analyzing the contentions of the parties, the Court will follow the outline of arguments to be considered stated in the June 14, 2000, Order.

## I. DEFENDANTS' ARGUMENTS THAT CERTAIN CLAIMS AGAINST THE UNIVERSITY OF ALABAMA ARE BARRED BY ELEVENTH AMENDMENT SOVEREIGN IMMUNITY.

The Defendants contend that any claims against the University not presented under either Title VII of the Civil Rights Act of 1964 or the Equal Pay Act are barred by the doctrine of Eleventh Amendment sovereign immunity. The Plaintiffs do not contest this point.

The Supreme Court, in *Seminole Tribe of Florida v. Florida*, 517 U.S. 44, 54 (1996),
described the broad compass of the Eleventh Amendment and its bar to suit against the
States in federal court:

> The Eleventh Amendment provides:
>
> > "The Judicial power of the United States shall not be
> > construed to extend to any suit in law or equity, commenced
> > or prosecuted against one of the United States by Citizens of
> > another State, or by Citizens or Subjects of any Foreign
> > State."
>
> Although the text of the Amendment would appear to restrict only
> the Article III diversity jurisdiction of the federal courts, "we have
> understood the Eleventh Amendment to stand not so much for what it says,
> but for the presupposition . . . which it confirms." *Blatchford v. Native
> Village of Noatak*, 501 U.S. 775, 779 (1991). That presupposition, first
> observed over a century ago in *Hans v. Louisiana*, 134 U.S. 1 (1890), has two
> parts: first, that each State is a sovereign entity in our federal system; and
> second, that "'[i]t is inherent in the nature of sovereignty not to be
> amenable to the suit of an individual without its consent,'" *id.*, at 13
> (emphasis deleted), quoting The Federalist No. 81, p. 487 (C. Rossiter ed.
> 1961) (A. Hamilton). See also *Puerto Rico Aqueduct and Sewer Authority*,
> *supra*, at 146 ("The Amendment is rooted in a recognition that the States,
> although a union, maintain certain attributes of sovereignty, including
> sovereign immunity"). For over a century we have reaffirmed that federal
> jurisdiction over suits against unconsenting States "was not contemplated by
> the Constitution when establishing the judicial power of the United States."
> *Hans*, supra, at 15.

Consequently, not only actions grounded on diversity of citizenship against a State are
proscribed by the Eleventh Amendment, actions grounded on the presence of a federal
question are barred.

The University is, pursuant to Alabama law, an arm of the State of Alabama,
entitled to sovereign immunity from suit in federal court. See *Lassiter v. Alabama A & M*

*University, Board of Trustees*, 3 F.3d 1482, 1485 (11th Cir. 1993).  However, this bar is not absolute.  If Congress makes a clear and unmistakable waiver of the States' immunity pursuant to an amendment to the Constitution made after the ratification of the Eleventh Amendment, a plaintiff may bring an action pursuant to the statutory provision on which sovereign immunity has been waived.  See *Seminole Tribe of Florida v. Florida*, 517 U.S. at 54-65.  While Congress could use its power under section 5 of the Fourteenth Amendment to generally waive the sovereign immunity of the States in suits brought by individuals to remedy deprivations of Fourteenth Amendment constitutional rights under 42 U.S.C. § 1983, see *Kimel v. Florida Board of Regents*, — U.S. —, 120 S.Ct. 631, (2000) ("Section 5 of the Fourteenth Amendment . . . does grant Congress the authority to abrogate the States' sovereign immunity"), it has chosen not to do so, instead waiving sovereign immunity for suits brought under statutes targeting the violation of a smaller range of Fourteenth Amendment constitutional rights.  As such, the Plaintiffs' claims against the University pursuant to 42 U.S.C. § 1983 are due to be DISMISSED, with prejudice.

II. DEFENDANTS' ARGUMENTS THAT CERTAIN CLAIMS FOR DAMAGES AGAINST THE INDIVIDUAL DEFENDANTS IN THEIR OFFICIAL CAPACITY ARE BARRED BY ELEVENTH AMENDMENT SOVEREIGN IMMUNITY.

The Defendants contend that the Plaintiffs' damages claims against the individual Defendants in their official capacities under 42 U.S.C. § 1983 are also due to be dismissed based upon the doctrine of Eleventh Amendment sovereign immunity.  The Plaintiffs do not dispute this, except insofar as they seek prospective injunctive relief under 42 U.S.C. § 1983.  Although the Plaintiffs do not explicitly assert what prospective injunctive relief they would be seeking, presumably they are asking the Court to enjoin the University to

craft a pay and evaluation scale that did not have a discriminatory impact upon female employees of the University.[4]

Since *Ex parte Young*, 209 U.S. 123, 155-56 (1908) it has been the case that "individuals who, as officers of the state, are clothed with some duty in regard to the enforcement of the laws of the state, and who threaten and are about to commence proceedings, either of a civil or criminal nature, to enforce against parties affected an unconstitutional act, violating the Federal Constitution, may be enjoined by a Federal court of equity from such action." An individual agent of the State is deprived of such sovereign immunity on the rationale that, by performing or threatening to perform an unconstitutional act, the agent is "stripped of his or her official or representative character" and is subject to injunction, as is any other actor. *Id.*, at 60. See *Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89, 104-05 (1984) (noting that the reasoning of *Ex parte Young* "created the 'well- recognized irony' that an official's unconstitutional conduct constitutes state action under the Fourteenth Amendment but not the Eleventh Amendment"). From a State agent in his or her official capacity a plaintiff may extract only prospective equitable relief, not retroactive relief that would result in the payment of monies from the public fisc. See *Edelman v. Jordan*, 415 U.S. 651, 665 (1974) and *Jackson v. Georgia Department of Transportation*, 16 F.3d 1573, 1577 (11th Cir. 1994).

In *Seminole Tribe*, the Supreme Court crafted an additional limitation on the obtainability of injunctive relief in a suit against an individual officer of a State. "[W]here Congress has prescribed a detailed remedial scheme for the enforcement against a State of a statutorily created right, a court should hesitate before casting aside those limitations and permitting an action against a state officer based upon *Ex parte Young*." *Seminole*

---

[4] While the Plaintiffs' complaint states a broad list of injunctive remedies sought by them, many of these requests appear to have been abandoned and all are forms of equitable relief that cannot be extracted from the individual Defendants in their official capacities.

*Tribe of Florida v. Florida*, 517 U.S. at 74. In essence, district courts should be reluctant to strain the employment of *Ex parte Young* in cases where Congress has provided a scheme for remedial relief of a right, however effective or ineffective that scheme may be.

Here, in their section 1983 claims, the Plaintiffs complain of violations of their rights of the equal protection of the laws contained in the Fourteenth Amendment to the Constitution, rather than of the violation of any statutorily-created right. However, Congress has provided protections against gender-based discrimination in violation of the Fourteenth Amendment both under Title VII of the Civil Rights Act and under the Equal Pay Act. Further, Title VII contains a detailed remedial scheme for the protection of rights insured by its provisions. See generally 42 U.S.C. § 2000e. Consequently, this Court can see no basis for extending the *Ex parte Young* rationale to the present case to permit a claim for prospective injunctive relief against the individual Defendants in their official capacities under 42 U.S.C. § 1983. All claims against the individual Defendants in their official capacities pursuant to 42 U.S.C. § 1983 will therefore be DISMISSED, with prejudice.[5, 6]

---

[5] The Court would note that this is not a holding generally applicable to section 1983 claims, but only to those section 1983 claims the underpinnings of which are constitutional or statutory rights afforded protection through an alternative remedial scheme. This is particularly so where the alternative remedial scheme affords a remedy against the States themselves, rather than officials of the States.

[6] Although this issue is not a subject of the present opinion, it appears that in the years since the present lawsuit was initiated, the University changed its pay-setting system. As such, the Plaintiffs may also be prevented from seeking injunctive relief against the officers of the University, it being the case that "a plaintiff may not use the doctrine to adjudicate the legality of past conduct." *Summit Medical Associates v. Pryor*, 180 F.3d 1326, 1337 (11th Cir. 1999).

III. DEFENDANTS' ARGUMENTS THAT BOTH THE UNIVERSITY OF ALABAMA AND THE INDIVIDUAL DEFENDANTS IN THEIR OFFICIAL CAPACITY ARE NOT "PERSONS" WITHIN THE SCOPE OF 42 U.S.C. § 1983.

The Defendants contend that neither the University nor the individual Defendants in their official capacities can be sued under 42 U.S.C. § 1983, as they are not considered "persons' within the meaning of the statute. The Plaintiffs concede that the University is not a "person" within the meaning of section 1983, but that the individual officers in their individual capacities are "persons" within the scope of the statute. While this issue has been mooted by the Court's resolution of the Eleventh Amendment sovereign immunity issues, the Court would note that while the University is not a "person" within the meaning of section 1983, see *Will v. Michigan Department of State Police*, 491 U.S. 58, 71 (1989), "a state official in his or her official capacity, when sued for injunctive relief, would be a person under § 1983 because 'official-capacity actions for prospective relief are not treated as actions against the State.'" *Id.*, at 71 n.10.

IV. DEFENDANTS' ARGUMENTS THAT THE PLAINTIFFS' CONSTITUTIONAL CLAIMS BROUGHT PURSUANT TO 42 U.S.C. § 1983 FAIL AS A MATTER OF LAW BECAUSE THE PLAINTIFFS ARE UNABLE TO DEMONSTRATE THAT THEY HAVE SUFFERED A "CONSTITUTIONAL INJURY" — THAT IS, THE PLAINTIFFS CANNOT DEMONSTRATE DEPRIVATION OF A LIFE, LIBERTY, OR PROPERTY INTEREST.

The Defendants argue that the Plaintiffs cannot state any Fourteenth Amendment claims against them pursuant to 42 U.S.C. § 1983 because the Plaintiffs were not deprived of a life, liberty, or property interest. The Plaintiffs claim, by contrast, that their claims of intentional sex discrimination against the Defendants rise to the level of a violation of the Equal Protection Clause of the Fourteenth Amendment. Because their claims are founded on violations of the Equal Protection Clause, they need not demonstrate that they were deprived of any life, liberty or property interest in order to obtain relief.

In the recent case of *Thigpen v. Bibb County, Georgia, Sheriff's Department*, — F.3d —, 2000 WL 913061 (11th Cir. July 7, 2000), the Eleventh Circuit Court of Appeals addressed the very issue presented here:

> The district court's identification of a property or liberty interest as a required element in an equal protection claim is erroneous because the text of the Fourteenth Amendment demonstrates that property and liberty interests are irrelevant to equal protection claims. Of the three clauses included in the second sentence of the Amendment's first section--the privileges and immunities clause, the due process clause, and the equal protection clause--only the due process clause alludes to "property" and "liberty." See U.S. CONST. AMEND. XIV, § 1; cf. *Board of Regents v. Roth*, 408 U.S. 564, 569-78 (1972) (discussing generally the due process clause's safeguard of property and liberty interests). In contrast, the applicability of the equal protection clause is not limited to only those instances in which property and liberty interests are implicated. See U.S. CONST. AMEND. XIV, § 1. Rather, to properly plead an equal protection claim, a plaintiff need only allege that through state action, similarly situated persons have been treated disparately. Cf. *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985); *Plyler v. Doe*, 457 U.S. 202, 216 (1982). The gravamen of Plaintiffs' complaints is that although all officers holding equal rank within the Department are similarly situated, the Reeves Decree mandates that the promotions conferred annually by Defendants be allocated substantially on the basis of race. Plaintiffs, therefore, have alleged proper equal protection claims.

As such, the Plaintiffs are not required to demonstrate that they were deprived of a life, liberty or property interest in order to state their claims that they were denied equal protection of the laws in violation of the Fourteenth Amendment.[7]

---

[7] The Court would, however, note that the Plaintiffs' claims that the Defendants engaged in a discriminatory pattern and practice of denying reclassifications and promotions and the maintenance of discriminatory pay systems providing lower pay to female employees are regularly stated in terms of a disparate impact claim as well as a disparate treatment claim. However, the Plaintiffs cannot maintain a mere disparate impact claim under the equal protection clause. See *Washington v. Davis*, 426 U.S. 229 (1976). As such, any constitutional disparate impact claim that the Plaintiffs seek to bring under section 1983 will be DISMISSED, with prejudice. As to their disparate treatment claim, "when a facially neutral federal statute is challenged on equal protection grounds, it is incumbent upon the challenger to prove that Congress 'selected

V. DEFENDANTS' ARGUMENTS THAT THE PLAINTIFFS' CLAIMS AGAINST THE INDIVIDUAL DEFENDANTS IN THEIR INDIVIDUAL CAPACITIES UNDER TITLE VII OF THE CIVIL RIGHTS ACT OF 1964 AND UNDER THE EQUAL PAY ACT FAIL BECAUSE THE INDIVIDUAL DEFENDANTS ARE NOT THEIR "EMPLOYERS" WITHIN THE MEANING OF EITHER STATUTE.

The Defendants contend that for purposes of Title VII of the Civil Rights Act and the Equal Pay Act that only the University is the Plaintiffs' employer. The Plaintiffs concede this point. Individual defendants are not liable for violations of Title VII of the Civil Rights Act, see *Busby v. City of Orlando*, 931 F.2d 764, 772 (11th Cir. 1991), or the Equal Pay Act. *Wascura v. Carver*, 169 F.3d 683, 686 (11th Cir. 1999). As such, all claims against the individual Defendants under Title VII of the Civil Rights Act and the Equal Pay Act will be DISMISSED.

VI. DEFENDANTS' ARGUMENTS THAT CERTAIN TITLE VII CLAIMS ARE BARRED BECAUSE THEY WERE BROUGHT MORE THAN 180 DAYS AFTER THE ALLEGED DISCRIMINATION (OR NOT AT ALL) AND THE PLAINTIFFS ARE NOT ENTITLED TO "PIGGYBACK" THEIR CLAIMS ONTO THE CHARGE OF ANOTHER EMPLOYEE.

The University contends that a number of the Plaintiffs' claims under Title VII of the Civil Rights Act are time-barred, because those Plaintiffs have either failed to file a timely charge of discrimination or because those Plaintiffs have failed to file a charge of discrimination at all. With respect to some claims, the Plaintiffs concur that the claims are to be dismissed. However, with respect to other claims, the Plaintiffs assert that they

---

or reaffirmed a particular course of action at least in part "because of," not merely "in spite of," its adverse effects upon an identifiable group.'" *Harris v. McRae*, 448 U.S. 297, 323 n. 26 (1980) (quoting *Personnel Administrator of Mass. v. Feeney*, 442 U.S. 256, 279 (1979)). As no claim against the University can be stated under section 1983, the Plaintiffs will be required to demonstrate that some particular Defendant, or group of Defendants, intentionally kept in place a system having a discriminatory impact on them because of the discriminatory effect that the policy would have on women as a class.

should be permitted to proceed to trial. The Court will examine the relevant claims of each Plaintiff.

## A. All Title VII claims of discrimination by Pandelis.

The University contends that all of Pandelis's claims are either time-barred or not within the scope of her EEOC charge. First, the University contends, although Pandelis's EEOC charge of October 19, 1990, encompasses her claim of discriminatory termination, that claim is untimely. According to the University, Pandelis learned of her impending termination on March 7, 1990, when she was provided a letter by Sloan indicating that her employment would cease on January 31, 1991. The University argues that because the letter was provided to Pandelis more than 180 days prior to the filing of her charge, the termination claim is time-barred. Second, the University argues that Pandelis's other promotion and pay claims were not encompassed within the scope of her charge and, as such, are time-barred. Pandelis responds that because the letter of March 7, 1990, could be read to allow her a one-year extension of employment on the possibility that she did not find another job, a reasonable trier of fact could find that it did not constitute the adverse employment action from which the 180-day limitations period began to run. Pandelis also asserts that her other claims were contained within her charge of discrimination and, as such, she is entitled to recover on those claims to the extent that the adverse employment actions associated with those claims occurred within the 180-day limitations period.

"Title VII expressly states that an employee must file a charge of discrimination with the EEOC within 180 days after the alleged discrimination in order to maintain an action under the Act." *Thomas v. Kroger Company*, 24 F.3d 147, 150 (11th Cir. 1994). In determining when the alleged discrimination occurred, the district court is to look at when the discriminatory action was made known to the employee, not when its

consequences were felt. *Ricks v. Deleware State College*, 449 U.S. 250, 258 (1980) (quoting *Abramson v. University of Hawaii*, 594 F.2d 202, 209 (9th Cir. 1979), for the proposition that "[t]he proper focus is upon the time of the discriminatory acts, not upon the time at which the consequences of the acts became most painful"). See also, *Beavers v. American Cast Iron Pipe Company*, 975 F.2d 792, 797 (11th Cir. 1992) (stating that "the Supreme Court clearly recognizes the distinction this court has drawn between the present effects of a one-time violation--as in Ricks--and the continuation of the violation into the present--as in Bazemore. Other circuits have also adopted this distinction"). In this case, a reasonable trier of fact could find that when she received the letter on March 7, 1990, Pandelis was not fully informed that her termination would take place on January 31, 1991. Rather, reading the facts in the light most favorable to Pandelis, a trier of fact could find that until she received notification in October of 1990 that her job would terminate on January 31, 1991, Pandelis reasonably believed that she would be employed by the University in her job as Assistant to the Dean of New College on February 1, 1991. As such, summary judgment on this claim is due to be DENIED.

Section 1601.12 of Title 29 of the Code of Federal Regulations describes the contents of a valid charge of discrimination filed with the EEOC:

(a) Each charge should contain the following:

(1) The full name, address and telephone number of the person making the charge except as provided in § 1601.7;

(2) The full name and address of the person against whom the charge is made, if known (hereinafter referred to as the respondent);

(3) A clear and concise statement of the facts, including pertinent dates, constituting the alleged unlawful employment practices: See § 1601.15(b);

(4) If known, the approximate number of employees of the respondent employer or the approximate number of members of the respondent labor organization, as the case may be; and

> (5) A statement disclosing whether proceedings involving the alleged unlawful employment practice have been commenced before a State or local agency charged with the enforcement of fair employment practice laws and, if so, the date of such commencement and the name of the agency.

(b) Notwithstanding the provisions of paragraph (a) of this section, a charge is sufficient when the Commission receives from the person making the charge *a written statement sufficiently precise to identify the parties, and to describe generally the action or practices complained of.* . . .

29 C.F.R. § 1601.12 (emphasis added).  In determining the scope of the allegations in an EEOC charge, the Fifth Circuit Court of Appeals has held, in a case binding on the courts of this Circuit, that

> . . . the crucial element of a charge of discrimination is the factual statement contained therein. Everything else entered on the form is, in essence, a mere amplification of the factual allegations.

*Sanchez v. Standard Brands, Inc.*, 431 F.2d 455, 462 (5th Cir. 1970).  In construing whether a plaintiff has sufficiently articulated a claim of discrimination, a district court must generally read an EEOC charge with a fair degree of breadth, as "some charging parties are uneducated and inarticulate, and the procedural rules we develop in this case and in others must be sufficiently liberal to protect their rights."  *Id.*, at 463.  As the Court of Appeals further explained:

> As a general proposition, it is well established that 'the scope of an EEOC complaint should not be strictly interpreted.' *Baxter v. Savannah Sugar Refining Corp.*, S.D. Ga. 1968, 46 F.R.D. 56, 59. Such a generalization, however, does not answer the more precise question of what standard is to be utilized in measuring the proper scope of a complaint. This circuit has never before considered this precise question. At least one district court in this circuit has addressed itself to the question, however, and in our judgment it responded to the question by giving the correct answer. In *King v. Georgia Power Co.*, N.D. Ga. 1968, 295 F.Supp. 943, Judge Smith held that the allegations in a judicial complaint filed pursuant to Title VII 'may encompass any kind of discrimination like or related to allegations contained in the charge and growing out of such allegation during the pendency

> of the case before the Commission.' 295 F.Supp. at 947. In other words, *the 'scope' of the judicial complaint is limited to the 'scope' of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination.*

*Id.*, at 466-67.

In the case at hand, Pandelis complained in her charge not only of a discriminatory termination, but also that

> . . . the [University] has done nothing to effect my transition to greater responsibilities in other areas of the University. On information and belief, the Respondent's failure or refusal to do anything to effect my transition to greater responsibilities has been because of my sex and conforms to a general pattern and practice of sexual discrimination in hiring, job assignments, promotions, transfers, compensation and other terms and conditions of work.

Plaintiff's Class Certification Exhibit No. 25. This language would clearly indicate that the Plaintiff is challenging the University's failure to place her in any other positions in the University. As such, an investigation by the EEOC would reasonably encompass any denials of positions to which Pandelis had applied within 180 days prior to the filing of the EEOC charge. However, the only effect of the "general pattern and practice of sexual discrimination" upon Pandelis's employment are alleged promotion denials. She does not, in her charge, complain that the pattern and practice resulted in her suffering lessened compensation or assignments or other terms and conditions of employment. Indeed, the "general pattern and practice language" is simply too broad to be of any use to an EEOC investigator in resolving any claims. There is no indication of who at the University is engaging in this policy or practice or whether there is a University-wide system that results in such discrimination. Further, it simply falls short of the minimal requirement of 29 C.F.R. § 1601.12(b) that a charge of discrimination "describe generally the action or practices complained of." It is, in short, surplusage. While a court is to read a plaintiff's EEOC charge liberally, it is not required to stretch its meaning beyond the bounds of

common sense or struggle to provide a meaning where none is clearly given. As such, the Court concludes that only the denial of promotion claims arising within 180 days of the filing of the EEOC charge can give rise to claims out of that charge.

Pandelis avers that, even if her own charge is found not to contain a viable claim that the University discriminated against her in the amount of pay she was afforded under the AP system, she should be permitted to proceed on her claim by piggybacking onto the EEOC charge of Anita Dowling Bryce. A plaintiff who has not filed an EEOC charge is permitted to "piggyback" on the timely filing of an EEOC charge by another plaintiff to the action "who faced similar discriminatory treatment in the same time frame." *Gitlitz v. Compagnie Nationale Air France*, 129 F.3d 554, 557 (11th Cir. 1997). However, the Eleventh Circuit Court of Appeals has disallowed a party filing an EEOC charge to rely upon another party's EEOC charge in presenting her claims of discrimination.

> A plaintiff who has not filed an individual EEOC charge may invoke the single-filing rule where such plaintiff is similarly situated to the person who actually filed an EEOC charge, and where the EEOC charge actually filed gave the employer notice of the collective or class-wide nature of the charge. In such circumstances, it is reasonable from the perspective of the employer's interests and the interests of economy of administration within the agency to permit such a plaintiff to rely upon the other claimant's EEOC charge. However, where a plaintiff has filed an individual EEOC charge, such a plaintiff should be required to rely upon his or her own EEOC charge, and cannot reasonably rely upon the other claimant's charge.

*Id.*, at 558. Further, even were this Court to allow such "piggybacking," Pandelis's pay discrimination claim accrued, at the latest on January 31, 1991, more than 180 days prior to the date that Bryce's EEOC charge was filed on November 21, 1991.

Consequently, all Title VII claims of Pandelis, other than her termination claim and her denial of promotion claims arising on or after May 22, 1990, will be DISMISSED, with prejudice.

## B. All Title VII claims of discrimination by Deason.

Deason filed her EEOC charge on July 28, 1992, alleging in broad and general terms that she was discriminated against by the University in compensation and in job assignments and promotions; she does not aver any specifics on such claims. Without considering the issue of whether the charge is adequate to support Deason's specific claims of discrimination,[8] the Court concludes that the time period covered by this charge would encompass Deason's second period of employment with the University as a Secretary II in the University's College of Engineering. However, Deason's first period of employment as a Records Clerk I & II in the Records Office ending September 12, 1990 clearly falls outside of that period. Any pay discrimination claims arising out of the earlier period of employment cannot constitute a continuing violation either, as whatever violations the University may have committed do not extend through the nearly seventeen month period that she was unemployed; put another way, the pay violation continued only so long as Deason was being paid — when the pay stopped, the violation stopped. Further, assuming that Deason is entitled to "piggyback" her claims on the EEOC charge of Bryce filed on November 21, 1991, any claims arising out of the earlier period would still be too dated, as they could not have occurred within 180 days prior to the filing of Bryce's charge. As such, any Title VII claims arising out of Deason's employment with the University as a Records Clerk I & II in the Records Office will be DISMISSED, with prejudice.

---

[8] On this issue, see the discussion of the claims of Carr, *infra.*

**C. Claims of Keene arising from her employment in the Records Office.**

The University avers that the claims of Keene arising from her period of employment in the Records Office cannot be maintained because they accrued more than 180 days prior to the filing of her EEOC charge. Keene admits that her EEOC charge was filed far too late, but asserts that she can piggyback on Pandelis's charge to reach her claims based on her employment in the Records Office. Keene's last day of employment in the Records Office was on August 9, 1989. Therefore, even if Keene were entitled to piggyback onto Pandelis's charge of discrimination, her claims of discrimination would nonetheless fall outside of the 180 day period in which her claims would be required to accrue to be encompassed within the charge. As such, all Title VII claims of Keene arising from her period of employment in the Records Office will be DISMISSED, with prejudice.

**D. Title VII claims of Dennis arising (1) from denial of an Art Director position in University Relations; (2) from denial of a Graphics position in Continuing Studies; (3) from denial of Production Manager's position in the University Press; and (4) from failure of the University of Alabama to reclassify her position from non-exempt OCT to exempt professional.**

The University contends that Dennis's claims arising (1) from denial of an Art Director position in University Relations; (2) from denial of a Graphics position in Continuing Studies; (3) from denial of Production Manager's position in the University Press; and (4) from failure of the University to reclassify her position from non-exempt OCT to exempt professional are due to be dismissed, as Dennis failed to file a timely EEOC charge on these claims and cannot "piggyback" on any charge of discrimination that would make these claims timely. Dennis asserts that her claim that the University did not reclassify her position to an AP position is within the scope of her EEOC charge because, although she was specifically denied the reclassification on September 12, 1990, the denial of reclassification was a continuing violation that extended into the 180 day

period for filing an EEOC charge. Regarding the denial of positions, Dennis admits that the position denials were not continuing violations, but that she is entitled to "piggyback" her claims on the charges filed by Pandelis and Bryce.

Only violations that occur within 180 days prior to the filing of the EEOC charge may be made a subject of the EEOC charge or any ensuing judicial action. Two kinds of discriminatory events can be said to accrue within the charge filing period: These are, one, discrete violations, which are deemed to accrue when the adverse employment decision is taken, and two, continuing violations, which are discriminatory acts that occur over lengthy periods of time. The dividing line between the two types of violation is a grey one and whether a particular event constitutes a discrete act of alleged discrimination or whether it is part of an ongoing discriminatory act is often a difficult matter to sort out.

In *Knight v. Columbus, Georgia*, 19 F.3d 579, 580-81 (11th Cir. 1994), the Eleventh Circuit Court of Appeals described when an act could be deemed part of a continuing course of discriminatory conduct:

"The standard for determining whether an employment practice constitutes a continuing violation was set forth in *Gonzalez v. Firestone Tire & Rubber Co.*, 610 F.2d 241 (5th Cir.1980)." *Beavers v. American Cast Iron Pipe Co.*, 975 F.2d 792, 796 (11th Cir.1992). In *Gonzalez*, a suit brought under Title VII, we held that:

A past act of discrimination for which a party did not file a charge of discrimination with the EEOC within the limitations period is legally equivalent to a discriminatory act that occurred before the enactment of Title VII. Although such a past discriminatory act may continue to affect an employee's present pay and fringe benefits, such an effect does not constitute a continuing violation of Title VII. . . . [T]he critical question is whether any present violation exists. . . . [W]here the employer engaged in a discrete act of discrimination [outside the limitations period], allegations that the discriminatory act continues to adversely affect the employee or that the employer presently refuses to rectify its past violation will not satisfy the [statute of limitations].

> *Gonzalez*, 610 F.2d at 249 (citations omitted). The critical distinction in the
> continuing violation analysis, therefore, is whether the plaintiffs complain of "'the
> present consequence of a one time violation, which does not extend the limitations
> period, [or] the continuation of that violation into the present, which does.'"
> *Calloway v. Partners Nat'l Health Plans*, 986 F.2d 446, 448 (11th Cir. 1993) (quoting
> *Beavers*, 975 F.2d at 796); see also *Ross v. Buckeye Cellulose Corp.*, 980 F.2d 648, 658
> (11th Cir. 1993).

Here, the difficulty is compounded by the mixed nature of Dennis's claim regarding reclassification. In the first instance, her claim is that under the then-existing system, she should have been classified as an AP employee after she requested reclassification in 1990 and that the University's continued failure to do so constitutes a continuing violation. Embedded in this as well is a second claim that, with regard to employees of a similar status as her, the divided OCT and AP systems are inherently discriminatory and that she should have been classed in a more neutral pay and performance evaluation system. Clearly, the former claim is based upon a one-time denial, with continued repercussions that the University did not seek to undo, while the latter claim strikes at continuing policy of pay discrimination allegedly maintained by the University up to and continuing through the time that Dennis filed her EEOC charge. To the extent then, that Dennis claims that the University failed to reclassify her job as an AP position, that claim is outside of the 180-day period of her EEOC charge. To the extent, however, that she asserts that the University's pay setting system caused her to receive a lower paycheck than men performing similar work in the AP system, her claim is within the scope of her EEOC charge.

Dennis attempts to surmount her failure to file a timely charge by relying on the charges of Pandelis and Deason to permit her to advance her claims. As previously stated, the single-filing rule permits a plaintiff who has not filed an EEOC charge to "piggyback" on the timely filing of an EEOC charge by another plaintiff to the action "who faced

similar discriminatory treatment in the same time frame." *Gitlitz v. Compagnie Nationale Air France*, 129 F.3d at 557.

In addition to having her reevaluation denied on September 12, 1990, Dennis was allegedly denied a promotion to the production manager position in early July of 1990, another promotion to the Graphics position on November 1, 1990, and a third promotion to an Art Director position on February 12, 1991, all within the period covered by the charge of Pandelis, but not within the 180 day period prior to the charge filed by Bryce. As such, the relevant issue for the Court is whether Dennis's claims are sufficiently similar to those of Pandelis that Dennis is entitled to take advantage of the single-filing rule.

A plaintiff in a lawsuit may rely on the charge of co-plaintiffs in that action as satisfying a condition precedent to the bringing of the action if the charge on which the plaintiff relies is (1) not invalid and (2) "the individual claims of the filing and non-filing plaintiff arise out of *similar discriminatory treatment* in the same time frame." *Calloway v. Partners National Health Plans*, 986 F.2d 446, 450 (11th Cir. 1993) (emphasis added). Dennis cannot demonstrate sufficient similarity. First, there is no claim comparable to Dennis's reevaluation claim in Pandelis's charge. Second, as to Dennis's claims that she was denied promotions, while Pandelis also alleges denials of promotions, the similarities with Pandelis cease there. There is no indication that the job denials were made by the same individuals or bodies or occurred in the same types of circumstances. Pandelis occupied a position in the AP system while Dennis is an OCT employee. Indeed, as the Court has noted, to the extent that Pandelis alleged a policy to deny promotions, she did not allege what that policy might be or how it may have affected her promotion opportunities; such a vacuous assertion of a policy cannot link Pandelis's claims to those of Dennis. As such, Dennis's Title VII claims arising (1) from denial of an Art Director position in University Relations; (2) from denial of a Graphics position in Continuing

Studies; (3) from denial of Production Manager's position in the University Press; and (4) from the specific failure of the University to reclassify her position from non-exempt OCT to exempt professional are due to be DISMISSED, with prejudice.

### E. All Title VII claims of Agee.

Agee did not file an EEOC charge, but seeks to "piggyback" onto the EEOC charge of Pandelis to overcome the limitations bar to her action. Agee was last employed by the University as a Secretary III in the OCT system on August 3, 1990, when she resigned as a consequence of an involuntary transfer. Agee has alleged a wide variety of claims, only two kinds of which can be arguably brought within the compass of Pandelis's EEOC charge: (1) Agee's claim of constructive discharge and (2) any denial of promotion claims by Agee. In order to take advantage of the single-filing rule, the claims of the charging and non-charging plaintiffs must arise out of similar discriminatory treatment. *Gitlitz v. Compagnie Nationale Air France*, 129 F.3d at 557. Here, Agee's constructive discharge claim shares no features in common with the claims of Pandelis and as such, is not sufficiently similar to Pandelis's claims to permit "piggybacking" under the single-filing rule. Further, there is no allegation that Agee applied for any promotions within 180 days prior to the date on which Pandelis filed her EEOC charge. As such, all Title VII claims of Agee in this action are due to be DISMISSED.

### F. All Title VII claims of Griffin.

Griffin was last employed by the University on January 31, 1989. Even permitting "piggybacking" of her claims onto Pandelis's EEOC charge, those claims would still fall outside of the 180-day period prior to the filing of Pandelis's charge of discrimination. As such, all of Griffin's Title VII claims will be DISMISSED, with prejudice.

**G. Title VII claims of Reece related (1) to her employment in University Television Services and (2) to sexual harassment occurring in the Philosophy Department.**

Reece filed no charge of discrimination in the instant action; thus, she must rely on charges of discrimination filed by other Plaintiffs to maintain her various discrimination claims arising from her employment in the University Television Services, which ended in January of 1990, and her sexual harassment claim arising out of her employment in the University's Philosophy Department.[9] First, as to any claims arising out of Reece's time spent in the University Television Services, even assuming that Reece could piggyback onto the earliest filed charge in this case, that of Pandelis, her claims would nonetheless be untimely. While Pandelis's EEOC charge was filed on October 19, 1990, Reece was terminated from the University Television Services in January of 1990, over eight months earlier. As such, all claims of Reece arising out of her period of employment with the University Television Services are due to be DISMISSED.

Reece contends that her Title VII sexual harassment claim arising from her treatment in the Philosophy Department is timely because she is able to "piggyback" onto a similar charge of sexual harassment filed by Morris on December 16, 1991, in which Morris stated, "I have also been harassed and subjected to a sexually hostile and abusive work environment because of my sex and because of my opposition to sexual harassment, favoritism and discrimination." However, for Reece to be able to "piggyback" onto Morris's charge of discrimination, there must be sufficient similarity between the claims charged by Morris and the claims of Reece. *Gitlitz v. Compagnie Nationale Air France*, 129 F.3d at 557. Here, such similarity is absent. While the claim of harassment by Morris is superficially similar to that Reece, in detail, the claims are distinct. Reece and Morris were not employed in the same department. The harassment allegedly endured by Reece

---

[9] While Reece may have other claims related to her employment in the Philosophy Department, the University only challenges her sexual harassment claim related to her time in that Department.

and allegedly endured by Morris occurred as the result of actions by different individuals. It is highly unlikely that investigation of Morris's claim of harassment by the EEOC would have revealed anything with regard to Reece's claim. Further, there is no indication that the particular events that constituted harassment are the same. As such, Reece cannot take advantage of the single-filing rule in order to introduce her claims of sexual harassment in this action. The claim of sexual harassment under Title VII will be DISMISSED, with prejudice.

## H.    All Title VII claims of Carr.

Carr did not file an EEOC charge and ended her employment with the University on July 5, 1991. Carr claims that she is able to "piggyback" on the charge of Pandelis, the charge of Bryce and the charge of Morris in order to fall within the limitations period. In addition to sexual harassment and constructive discharge claims, which apparently accrue on the final day of Carr's employment, July 5, 1991, Carr asserts the denial of promotion and unequal pay claims standard to all Plaintiffs to this action. Both Carr and Morris allege that they were subjected to harassment resulting in constructive discharge by the same individual, Roy Smith ("Smith"). As such, because Carr's claim was filed within 180 days of Morris's charge of discrimination alleging harassment and constructive discharge, Carr is entitled to proceed on those claims. However, Carr cannot rely on Pandelis's EEOC charge in order to present any denial of promotion claims as she has presented no evidence that Pandelis's denial of promotion claims would have revealed anything with regard to her claims.

This leaves the Court to consider which of Carr's claims can proceed under Bryce's EEOC charge.    Bryce's charge alleges (1) discrimination "on the basis of sex in compensation" through "the use of a pay setting system which has [a] disparate impact on women and involves disparate treatment in its administration" and (2) sex discrimination

in the delegation of "job assignments and job opportunities including, but not limited to, assignment of duties, titles, responsibilities, promotions and awarding of pay increases." What Bryce complained of and what the EEOC was called upon to investigate with regard to discrimination on the basis of sex in compensation is clearly delineated. The EEOC was requested to investigate the pay setting system of the University to determine the existence of discrimination. The context and character of any investigation the EEOC was called upon to take in pursuance of the more general allegation of discrimination in the assignment of jobs and assignments throughout the University is more difficult to limit. It would superficially seem that Bryce claim of discrimination is sufficiently broad to permit any employee presenting a claim of gender discrimination arising in the same time frame to avoid the charge-filing requirements of 42 U.S.C. § 2000e-5. This cannot be the case. While the second claim of discrimination may be adequate to alert the EEOC to a specific investigation of Bryce's personal claims pursuant to 29 C.F.R. § 1601.12(b), because that charge lacks any allegation of an identifiable, general, systematic practice or group of practices of the University undertaken by a shared group of individuals, it is insufficient to constitute a "broader" charge under the EEOC's regulations. As such, the second aspect of Bryce's charge of discrimination can only  support "piggybacking" of other claims of discrimination factually similar to hers and perpetrated by the same actors. Consequently, only Carr's claims of unequal pay arising from her placement in the OCT pay system can be the supported under Bryce's charge.

Consequently, all of Carr's Title VII claims, except her claims of constructive discharge, sexual harassment and unequal pay arising out of the University's pay-setting system, will be DISMISSED, with prejudice.

**I. Title VII claims of Morris based (1) on her Hay Point Evaluation and (2) on salary discrimination.**

Morris's claims based upon her Hay Point evaluation and salary discrimination to the extent that they do not accrue prior to June 19, 1991 — i.e., more than 180 days before the date on which Morris filed her charge of discrimination — are due to be DISMISSED. In determining which claims are due to be dismissed, Morris should attend to this Court's holding that each Hay Point evaluation is a discrete act. Because the pay discrimination claim is a continuing violation, Morris's pay discrimination claim falls within the 180-day period. All of Morris's Hay Point evaluation claims under Title VII arising prior to June 19, 1991, will be DISMISSED, with prejudice.[10]

**J.      All Title VII claims of Dockery.**

Dockery presents no claims of sexual harassment or constructive discharge. Indeed, her claims appear to be limited to claims (1) for denials of reclassification of her position with the University to an AP position in January of 1990 and to a higher level OCT position on August 27, 1990 and (2) for unequal pay. Dockery does not appear to present any claims for denials of promotions. In any case, for the reasons given with respect to the claims of Dennis and Carr, Dockery is limited to her unequal pay claims based upon disparate pay to male and female employees performing the same or similar work under the University's divided pay classification system. All other Title VII claims presented by her are due to be DISMISSED, with prejudice.

---

[10] In evaluating this issue, the Court is hampered by the Plaintiffs' lack of specificity in stating their specific claims. The Court would hope that the Plaintiffs would rectify this matter in the repleading that the Court will order the Plaintiffs to undertake to comply with the requirements of section 1983's heightened pleading standard.

## K. Title VII claim of McClendon arising out of denial of an expanded position given to Jim Rowell in 1988.

McClendon admits that her Title VII claim arising out of the denial of an expanded position is due to be dismissed. Therefore, this claim will be DISMISSED, with prejudice.

## L. Title VII claims of Smelser related (1) to her Hay Point evaluation and (2) to Rowell's 1988 promotion to an expanded position.

Like McClendon, Smelser admits that her claims related to Rowell's 1988 promotion to an expanded position are due to be dismissed. She claims, however, that her claim that her October 1, 1991, Hay Point evaluation was discriminatory is timely. Smelser filed her EEOC charge on April 14, 1992, more than 180 days after the occurrence of the evaluation. In addition, for the reasons given with regard to Carr, Smelser is not entitled to employ the single-filing rule to "piggyback" her claims onto Bryce's EEOC charge. As such, Smelser's Title VII claims related to her Hay Point evaluation and Rowell's 1988 promotion will be DISMISSED, with prejudice.

## M. Claims of Bryce related (1) to Rowell's 1988 promotion and (2) to her 1996 constructive discharge.

Like McClendon and Smelser, Bryce concedes that her Title VII claims against the University arising out of the 1988 promotion of Rowell is due to be dismissed. Further, Bryce fails to respond to the University's arguments regarding her averred constructive discharge claim. Bryce has not made any effort to amend such claim in this action in the four years since her retirement, nor has she filed any EEOC charge with respect to this claim. As such, Bryce's Title VII claim related to Rowell's 1988 promotion and her Title VII claim related to her 1996 constructive discharge will be DISMISSED, with prejudice.

## N. All Title VII claims of Lambert.

Lambert did not file a complaint in this case until April 9, 1993. At the time of her filing, Lambert made no allegations that she had been constructively discharged. For the reasons given with respect to Carr, the Court finds that only Lambert's unequal pay claim is timely. Consequently, all of Lambert's Title VII claims not related to her discriminatory pay claims will be DISMISSED, with prejudice.

## VII. DEFENDANTS' ARGUMENTS THAT THE FOLLOWING CERTAIN CLAIMS BROUGHT PURSUANT TO 42 U.S.C. § 1983 ARE TIME-BARRED BY THE STATUTE OF LIMITATIONS.

Claims brought under 42 U.S.C. § 1983 borrow the residual statute of limitations for tort claims of the state in which the constitutional tort occurred. *Free v. Granger*, 887 F.2d 1552, 1555 (11th Cir. 1989). In Alabama, this statute of limitations is two years, beyond which time a plaintiff's claim will be barred. The Defendants' aver that certain of the Plaintiffs' claims brought pursuant to 42 U.S.C. § 1983 are time-barred by the two-year statute of limitations. With respect to some claims, the Plaintiffs admit that their claims are time-barred. With respect to others, however, the Plaintiffs assert that they should be permitted to proceed.

Prior to addressing Defendants arguments that certain claims should be dismissed for a lack of timeliness, the Court would note that its ability to evaluate what the Plaintiffs' claims under section 1983 are and against whom they are stated is hampered by the Plaintiffs' lack of specificity in pleading such claims. Under Eleventh Circuit case law, the Plaintiffs are to adhere to a heightened pleading standard in presenting their claims under 42 U.S.C. § 1983. See *GJR Investments, Inc. v. County of Escambia, Florida*, 132 F.3d 1359, 1366 (11th Cir. 1998), and *Oladeinde v. City of Birmingham*, 963 F.2d 1481, 1485 (11th Cir. 1992). As such, the Plaintiffs shall re-plead all remaining section 1983 claims in this action with particularity. **The claims remaining are set forth, *infra*, in the conclusion of the memorandum opinion.** Any remaining section 1983 claims not pled with

particularity will be dismissed, with prejudice.  In the amended complaint, the Plaintiffs should also endeavor to clearly and explicitly state the claims that they are bringing under Title VII and the Equal Pay Act with respect to each Plaintiff and the factual allegations relevant to those claims, consistent with this opinion and the order that will be entered pursuant thereto.  **The amended complaint shall not under any circumstances address or attempt to re-plead any claims dismissed by the order accompanying this memorandum opinion.   Any attempt to re-plead claims dismissed by the accompanying order will result in appropriate sanctions and adverse action.**

## A.  All § 1983 claims of Deason.

The Defendants assert that all claims of Deason should be dismissed as untimely. Deason responds that only her claims arising before September 17, 1990, two years before she was made a party to this action, are due to be dismissed.  Since Deason ceased work in the Records Office before September 17, 1990, all claims pursuant to § 1983 arising out of her employment in that office will be DISMISSED, with prejudice.  However, Deason's claims arising out of her employment with the University as a Secretary II in the College of Engineering beginning on February 24, 1992, will not be barred by the statute of limitations.

## B.  Section 1983 claims of Keene arising from her employment in the Records Office of the University.

The Defendants contend that all claims of Keene arising from her employment in the Records Office are due to be dismissed because her period of employment in the Records Office ended on August 9, 1989.  Keene does not dispute and voluntarily relinquishes any claims pursuant to 42 U.S.C. § 1983 arising out of her period of

employment in the Records Office. As such, Keene's claims will be DISMISSED, with prejudice.

**C. Section 1983 claims of Dennis arising (1) from denial of an Art Director position in University Relations; (2) from denial of a Graphics position in Continuing Studies; (3) from denial of Production Manager's position in the University Press; and (4) from failure of the University of Alabama to reclassify her position from non-exempt OCT to exempt professional.**

The Defendants argue to be untimely Dennis's claims that she (1) was denied an Art Director position in University Relations; (2) was denied a Graphics position in Continuing Studies; (3) was denied a Production Manager's position in the University Press; and (4) was not reclassified from a non-exempt OCT position to an exempt professional position in violation of the Equal Protection Clause of the Fourteenth Amendment. Dennis responds that because she joined this action on September 17, 1992, all of her section 1983 claims accruing after September 17, 1990, can be brought in this action. Therefore, Dennis asserts, only her claim that she was denied the Production Manager's position in the University Press is time barred, having accrued in early July of 1990. As such, Dennis's section 1983 claim arising out of the denial of a promotion to the Production Manager's position in the University Press will be DISMISSED, with prejudice.

The next issue is whether Dennis's claim related to the University's failure to reclassify her, which occurred in the week of September 9, 1990, accrued during that week. Dennis asserts that the reclassification denial constitutes an ongoing violation. The principles guiding the determination of whether a discriminatory decision is ongoing for purposes of overcoming a section 1983 statute of limitations bar are the same as those that guide the determination of whether a violation is continuing for purposes of Title VII. Thus, the critical question in determining whether the denial of a reclassification is ongoing is "whether the plaintiffs complain of the present consequence of a one time

violation, which does not extend the limitations period, or the continuation of that violation into the present, which does." *Knight v. Columbus, Georgia*, 19 F.3d at 580-81 (internal citations omitted).  Here, Dennis is simply complaining of the continuation of the denial of a reevaluation into the present.  As such, her section 1983 claims related to the reclassification will be DISMISSED, with prejudice.

Nonetheless, Dennis is correct that her section 1983 claims related to the denial of the Art Director position and the denial of the Graphics position are timely, having accrued after September 17, 1990.  With respect to these claims, the Defendants' motion for summary judgment will be DENIED.

**D.  All section 1983 claims of Agee.**

In her brief in response to the Defendants' motion for summary judgment, Agee asserts that she does not seek to bring any claims against the Defendants under section 1983.  As such, all section 1983 claims of Agee will be DISMISSED, with prejudice.

**E.  All section 1983 claims of Griffin.**

In her brief in response to the Defendants' motion for summary judgment, Griffin asserts that she does not seek to bring any claims against the Defendants under section 1983.  As such, all section 1983 claims of Griffin will be DISMISSED, with prejudice.

**F.  Section 1983 claim of Reece related to her employment in the University Television Services.**

In her brief in response to the Defendants' motion for summary judgment, Reece asserts that she does not seek to bring any claims against the Defendants under section 1983 arising out of her employment in the University Television Services.  As such, all

section 1983 claims of Reece arising from her employment in the University Television Services will be DISMISSED, with prejudice.

### G. Section 1983 claims of Morris based (1) on her Hay Point evaluation score and (2) on salary discrimination.

The Defendants aver that Morris's claims based upon her Hay Point evaluation score and salary discrimination are untimely. Morris joined this action on January 8, 1992. Therefore, to the extent that these claims accrued before January 8, 1990, they are to be DISMISSED, with prejudice. As to claims falling within the limitations period, the Defendants' motion for summary judgment will be DENIED. In amending the complaint, the Plaintiffs should specifically state which of Morris's claims remain and the factual predicates of those claims.

### H. Section 1983 claim of McClendon arising out of denial of the expanded position given to Rowell in 1988.

In her brief in response to the Defendants' motion for summary judgment, McClendon asserts that she does not seek to bring any claims against the Defendants under section 1983 arising out of the denial of the expanded position given to Rowell in 1988. As such, McClendon's section 1983 claim arising out of the 1988 denial of promotion will be DISMISSED, with prejudice.

### I. Section 1983 claims of Smelser related (1) to her Hay Point evaluation score and (2) to Rowell's 1988 promotion.

Like McClendon, Smelser concedes that her section 1983 claims arising out of Rowell's 1988 promotion are due to be dismissed. As such, McClendon's section 1983 claims arising out of Rowell's 1988 promotion will be DISMISSED, with prejudice. However, Smelser contends that her section 1983 claim that her October 1, 1991, Hay

Point evaluation was discriminatory is timely. Smelser became a party to this action on September 17, 1992. Consequently, any section 1983 claim accruing after September 17, 1992, including her Hay Point evaluation claim, is timely. As to Smelser's section 1983 claim of discrimination arising out of her October 1, 1991, Hay Point evaluation, the Defendants' motion for summary judgment will be DENIED.

## J. Section 1983 claims of Bryce related (1) to Rowell's 1988 promotion and (2) to her 1996 retirement.

In her brief in response to the Defendants' motion for summary judgment, Bryce asserts that she does not seek to bring any claims against the Defendants under section 1983 arising out of Rowell's 1988 promotion or her 1996 retirement. With respect to the 1996 discharge, Bryce rather seeks to argue that because her retirement was forced, any backpay that she ultimately recovers will not be limited by her retirement. This is not a matter before the Court in the Defendants' motion for summary judgment and therefore will not be addressed. Bryce's section 1983 claims arising out of Rowell's 1988 promotion and 1996 discharge will be DISMISSED, with prejudice.

## K. All section 1983 claims of Lambert.

In her brief in response to the Defendants' motion for summary judgment, Lambert asserts that she does not seek to bring any claims against the Defendants under section 1983. As such, all section 1983 claims of Lambert will be DISMISSED, with prejudice.

VIII. DEFENDANTS' ARGUMENTS THAT CERTAIN CLAIMS MADE PURSUANT TO THE EQUAL PAY ACT ARE UNTIMELY.

The statute of limitations for wage discrimination claims under the Equal Pay Act is two years. See *Mitchell v. Jefferson County Board of Education*, 936 F.2d 539, 548 (11th

Cir. 1991). As such, for a Plaintiff's Equal pay Act claims to have timely accrued, those claims must have accrued within two years of her appearance in this action. Defendants assert that certain Equal Pay claims of only five Plaintiffs to this action are untimely, those of Deason, Keene, Agee, Griffin and Reece. The Plaintiffs admit that all of the Equal Pay Act claims Agee and Griffin are due to be dismissed; that the Equal Pay Act claims of Keene related to her employment in the Records Office are due to be dismissed; that the Equal Pay Act claims of Reece related to her employment in the University Television Services are due to be dismissed; and the Equal Pay Act claims of Deason arising out of her time working in the Records Office are due to be dismissed. However, Deason disputes that her Equal Pay Act claim arising from her time working as a Secretary II on the College of Engineering should be dismissed. The Court agrees. Deason started work as a Secretary II in the College of Engineering within two years of her becoming a party to this action on September 17, 1992. Therefore, with respect to Deason's claims arising out of her employment in the College of Engineering, the Defendants' motion for summary judgment will be DENIED. The Equal Pay Act claims of Agee and Griffin; the Equal Pay Act claims of Keene related to her employment in the Records Office; the Equal Pay Act claims of Reece related to her employment in the University Television Services; and the Equal Pay Act claims of Deason arising out of her time working in the Records Office will all be DISMISSED, with prejudice.

## Class Certification

The Plaintiffs seek to have certified a class defined as follows:

All female, non-faculty employees of the University of Alabama who have held, or are holding, office-clerical-technical ("OCT") or administrative-professional ("AP") positions at the University.

Plaintiffs' Second Memorandum in Support of Class Certification at 25.  The class, which the Plaintiffs propose to have certified pursuant to Federal Rule of Civil Procedure 23(b)(2), consists of women who were subjected to discrimination by and seek to remedy the University's compensation system for non-faculty jobs, including its pay, promotional and reclassification policies, practices and procedures.  The factual allegations about the OCT and AP pay-setting systems relevant to this motion have been recounted by the Court in its discussion of the Defendants' motion for summary judgment.

In *Culpepper v. Inland Mortgage*, 189 F.R.D. 668, 670 (N.D. Ala. 1999), this Court discussed the background principles governing the determination of class certification expressed in prior caselaw:

> The class-action device was designed as "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Califano v. Yamasaki*, 442 U.S. 682, 700-701, 99 S.Ct. 2545, 61 L.Ed.2d 176[ ]. Class relief is "peculiarly appropriate" when the "issues involved are common to the class as a whole" and when they "turn on questions of law applicable in the same manner to each member of the class." *Id.*, at 701, 99 S.Ct. 2545[ ]. For in such cases, "the class-action device saves the resources of both the courts and the parties by permitting an issue potentially affecting every [class member] to be litigated in an economical fashion under Rule 23." *Ibid.*

*General Telephone Company of the Southwest v. Falcon*, 457 U.S. 147, 155, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982).  A district court is to make the determination of whether an action should proceed as a class action "[a]s soon as practicable after the commencement of an action brought as a class action. . . ." Fed.R.Civ.P. 23(c)(1). See *American Pipe & Const. Co. v. Utah*, 414 U.S. 538, 547, 94 S.Ct. 756, 38 L.Ed.2d 713 (1974), *reh'g denied*, 415 U.S. 952, 94 S.Ct. 1477, 39 L.Ed.2d 568.  "The decision to certify is within the broad discretion of the court, but that discretion must be exercised within the framework of rule 23." *Castano v. American Tobacco Co.*, 84 F.3d 734, 740 (5th Cir. 1996).

"A class action may be maintained only when it satisfies all the requirements of Fed. R. Civ. P. 23(a) and at least one of the alternative requirements of Rule 23(b)." *Jackson v. Motel 6 Multipurpose, Inc.*, 130 F.3d 999, 1005 (11ᵗʰ Cir. 1997) (footnote omitted). See also *Pickett v. Iowa Beef Processors*, 209 F.3d 1276, 1279 (11ᵗʰ Cir. 2000) (same). "Rule 23(a) provides that a class may be certified if the following requirements are met: (1) numerosity: the class is not so numerous that joinder of all members is impracticable; (2) commonality: questions of law or fact are common to the class; (3) typicality: the representatives of the class present claims or defenses that are typical of the class; and (4) adequacy: the representatives of the class will fairly and adequately protect the interests of the class." *Id.* In addition to the Rule 23(a) requirements, she must demonstrate that "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or correcting declaratory relief with respect to the class as a whole." FED. R. CIV. P. 23(b)(2). In meeting each of the requirements, the burden of proof rests with the plaintiff "to establish the propriety of class certification." See *Rutstein v. Avis Rent-A-Car Systems, Inc.*, — F.3d —, 2000 WL 569948 at *3 (11ᵗʰ Cir. 2000).

Here the Court finds that the class proposed by the Plaintiffs is simply to broad and diverse to satisfy the elements of commonality, typicality, and adequacy under Rule 23(a) or the requirement that the defendant act in a manner generally applicable to the class under Rule 23(b)(2). Under Federal Rule of Civil Procedure 23(a)(2), "[a]ll questions of fact and law need not be common to satisfy the rule." *Hanlon v. Chrysler Corporation*, 150 F.3d 1011, 1019 (9ᵗʰ Cir. 1998). Rather, commonality is satisfied where the claim on which class certification is to be granted is in some way "susceptible to class-wide proof." *Hudson v. Delta Air Lines, Inc.*, 90 F.3d 451, 457 (11ᵗʰ Cir. 1996). There is no indication that the claims presented will be susceptible to class-wide proof. First, the Plaintiffs in this action come from differing pay systems and their theories as to how generally those

pay systems are discriminatory vary. For the OCT employees, the pay system is allegedly discriminatory in relation to the percentage of males performing similar work at higher pay in the AP category, on the basis of the congregation of female employees at the bottom of the ladder in the OCT system, and on the basis of the subjectivity introduced in the job position comparison that the office of compensation performs. For the AP employees, by contrast, the alleged discrimination appears to be solely in the subjective Hay Point evaluations that the employees are required to undergo. As such, any questions of discrimination in either system will vary. Second, claims of discrimination in the awarding of promotions will also have to be evaluated on a stratified basis for the kinds of job at issue in order to determine if women are under-represented in those positions relative to the qualified applicant pool. Finally, for each type of Plaintiff in a category of job, the Plaintiffs will be required to demonstrate what categories or groups of categories can be used for comparison and whether men performing that category of job disproportionally receive higher pay. This will require the designation of numerous categories and subcategories, perhaps alleging different theories of recovery, each of which may or may not have a representative. Here, there simply are insufficient plaintiffs to represent all of these subclasses, see *Prado-Steinman v. Bush*, 99-11030 (11th Cir. Aug. 11, 2000), raising not only standing problems for some of those subclasses, but highlighting the wide disparities among the proposed representative Plaintiffs' class claims. Therefore, the Court finds commonality to be absent within the class.

The key to the typicality inquiry is whether the named plaintiff, in proving her claim, will advance the common claims of the putative class members. See *Sprague v. General Motors Corporation*, 133 F.3d 388, 399 (6th Cir. 1998) ("The premise of the typicality requirement is simply stated: as goes the claim of the named plaintiff, so go the claims of the class."). In making this inquiry into typicality, a district court is to pay heed "to the nature of the claim or defense of the class representative, and not to the specific

facts from which it arose or the relief sought." *Jones v. Shalala*, 64 F.3d 510, 513 (9th Cir. 1995). In other words, a district court must determine whether the proof required to establish an element of the named plaintiff's claim would suffice to prove that element for all class members. See *Andrews v. American Telephone & Telegraph Co.*, 95 F.3d 1014, 1022 (11th Cir. 1996), and *Jones v. Takaki*, 38 F.3d 321, 323 (7th Cir. 1994). This can generally be shown if an element of a named plaintiff's claim is to be proven with reference to an "event or practice or course of conduct that gives rise to the claims of other class members and his or her claims are based on the same legal theory." *De La Fuente v. Stokley-Van Camp, Inc.*, 713 F.2d 225, 232 (7th Cir. 1983). See also *Kornberg v. Carnival Cruise Lines, Inc.*, 741 F.2d 1332, 1337 (11th Cir. 1984)("A sufficient nexus [between the named plaintiff and the class members] is established if the claims or defenses of the class and the class representative arise from the same event or pattern or practice and are based on the same legal theory."). While under the typicality analysis, all aspects of the claim of the named plaintiff and the putative class members need not be identical, where "the factual position of the representative markedly differs from that of other members of the class," typicality will be considered absent. *Id.* For the same reasons the Court found commonality to be absent, it also finds a want of typicality.

Federal Rule of Civil Procedure 23(a)(4) requires that the proposed representative of a putative class "fairly and adequately protect the interests of that class." FED. R. CIV. P. 23(a)(4). See *Pickett v. Iowa Beef Processors*, 209 F.3d at 1280 ("Rule 23(a)(4) requires that parties representing a class fairly and adequately protect the interests of class members."). The purpose of the adequacy requirement is to uncover whether the proposed class representative, for reasons external to deficiencies in the plaintiff's claim in common with those of the class, would be unable to effectively represent the class. "The adequate representation requirement involves questions of whether plaintiffs' counsel are qualified, experienced, and generally able to conduct the proposed litigation, and of whether

plaintiffs have interests antagonistic to those of the rest of the class." *Griffin v. Carlin*, 755 F.2d 1516, 1533 (11th Cir. 1985). Thus, a court's investigation into adequacy often involves not only an examination of the fitness of a named plaintiff to serve as a representative of the putative class, but the fitness of that representative's preferred counsel as well. Even were the Plaintiffs' claims cohesive, certain claims by OCT employees, that individuals occupying AP system positions are getting paid more for the same work, may result in relief that upgrades the OCT workers' pay and positions but downgrades the pay and positions of female employees in the AP system doing similar work. Such adversity of interests is likely to cause inter-class conflicts between OCT representative members and members of the AP system who they also purport to represent. Further, some of the individual claims of the Plaintiffs in this action will require the Plaintiffs to take up adverse positions. For example, Bryce was McClendon's supervisor for some period relevant to this action and Bryce may be called upon to defend her actions in relation to McClendon's individual claims. As such, the Court cannot find the presence of adequacy of representation in this action.

The Seventh Circuit Court of Appeals recently discussed the role of class certification under Federal Rule of Civil Procedure 23(b)(2).

> Rule 23(b)(2) declares that class certification under that subsection is appropriate when "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole." Fed.R.Civ.P. 23(b)(2). The Rule itself is silent regarding whether Rule 23(b)(2) certification is permissible when, as in this case, the plaintiffs request monetary damages as well as "final injunctive relief or corresponding declaratory relief." However, the advisory note to Rule 23(b)(2) explains that the subsection "does not extend to cases in which the appropriate final relief relates exclusively or predominantly to money damages." Fed.R.Civ.P. 23(b)(2) advisory committee's note.
>
> As we explained in *Jefferson v. Ingersoll International Inc.*, 195 F.3d 894, 896 (7th Cir. 1999), the problem is that Rule 23(b)(2) provides for binding litigation on

> all class members without guarantees of personal notice and the opportunity to opt
> out of the suit. *By virtue of its requirement that the plaintiffs seek to redress a common*
> *injury properly addressed by a class- wide injunctive or declaratory remedy, Rule*
> *23(b)(2) operates under the presumption that the interests of the class members are*
> *cohesive and homogeneous such that the case will not depend on adjudication of facts*
> *particular to any subset of the class nor require a remedy that differentiates materially*
> *among class members.*

*Lemon v. International Union of Operating Engineers, Local No. 139*, 216 F.3d 577, 580 (7th
Cir. 2000). Here, as recounted by the Court in discussing the absence of commonality in
this action, the requisite cohesiveness and homogeneity are absent. Consequently, the
Plaintiffs' motion for class certification will be DENIED.

## Conclusion

For the foregoing reasons, (1) the renewed motion for class certification filed by
the Plaintiffs, Joyce Pandelis ("Pandelis"), Anita Dowling Bryce ("Bryce"), Paula Dennis
("Dennis"), Lynn Dockery ("Dockery"), Nora Virginia Keene ("Keene"), Patsy Reece
("Reece"), Judi McClendon ("McClendon"), Wiladean Smelser ("Smelser"), Norma Agee
("Agee"), Carmie Carr ("Carr"), Joy Deason ("Deason"), Roslyn Griffin ("Griffin"), and
Carolyn Morris ("Morris"), on May 26, 2000 (Doc. 102), will be DENIED; (2) the motion
for summary judgment by the Board of Trustees of the University of Alabama
("University"), Roger Sayers ("Sayers"), Hubert Kessler ("Kessler"), Robert A Wright
("Wright"), Coy B. Wood ("Wood"), Kay Staub ("Staub"), Roy Smith ("Smith"), Malcolm
McDonald ("McDonald"), Bernard J. Sloan ("Sloan"), and Edward Mullins ("Mullins") on
all claims against them filed on May 26, 2000 (Doc. No. 97) will be GRANTED, in part and
DENIED, in part, (3) the motion for summary judgment filed by Smith as to all claims of
Morris filed on May 26, 2000 (Docs. No. 100 & 105), will be GRANTED, in part and
DENIED, in part; (4) the motion for summary judgment filed by Smith as to all claims of

Deason filed on May 26, 2000 (Doc. No. 103), will be GRANTED, in part and DENIED, in part; (5) the motion for summary judgment filed by Smith as to all claims of Griffin filed on May 26, 2000 (Doc. No. 109), will be GRANTED, in part and DENIED, in part; (6) the motion for summary judgment filed by Smith as to all claims of Keene filed on May 26, 2000 (Doc. No. 112), will be GRANTED, in part and DENIED, in part; (7) the motion for summary judgment filed by Smith as to all claims of Carr filed on May 26, 2000 (Doc. No. 116), will be GRANTED, in part and DENIED, in part; and (8) a motion to strike the declaration of Chester I. Palmer ("Palmer") in Defendants' evidentiary submissions in opposition to Plaintiffs' motion for class certification filed by the Plaintiffs on July 7, 2000 (Doc. No. 143), will be DENIED, as moot.

The following claims will be DISMISSED, with prejudice:

I. SECTION 1983:

A. All claims of the Plaintiffs against the University and the individual Defendants in their official capacities.

B. The following claims against the individual Defendants in their individual capacities:

1. All claims of Deason arising out of her employment in the Records Office;

2. All claims of Keene arising out of her employment in the Records Office;

3. All claims of Dennis arising (1) from denial of the Production Manager's position in the University Press and (2) from failure of the University to reclassify her position from non-exempt OCT to exempt professional;

4. All claims of Agee;

5. All claims of Griffin;

6. Any claim of Reece related to her employment in University Television Services;

7.  Any claims of Morris based (1) on her Hay Point Evaluation and (2) on salary discrimination arising prior to January 8, 1990;

8.  McClendon's claim arising out of denial of the expanded position given to Jim Rowell;

9.  The claims of Willodean Smelser related to Rowell's 1988 promotion to the expanded position;

10. Any claims of Bryce related (1) to Rowell's 1988 promotion and (2) to her 1996 discharge; and

11. All claims of Robin Lambert.

## II. THE EQUAL PAY ACT:

A. All claims against the individual Defendants.

B. The following claims against the University:

1.  All claims of Deason arising out of her period of employment in the Records Office;

2.  All claims of Keene arising out of her employment in the Records Office;

3.  All claims of Agee;

4.  All claims of Griffin; and

5.  Any claim of Reece related to her employment in University Television Services.

## III. TITLE VII OF THE CIVIL RIGHTS ACT:

A. All claims against the individual Defendants.

B. The following claims against the University:

1.  All claims of discrimination by Pandelis not related to her termination and the denial of promotions occuring after April 22, 1990;

2.  All claims of discrimination by Deason arising out of her period of employment in the Records Office;

3.  All claims of Keene arising out of her employment in the Records Office;

4.  Claims of Dennis arising (1) from denial of an Art Director position in University Relations; (2) from

denial of a Graphics position in Continuing Studies; (3) from denial of Production Manager's position in the University Press; and (4) from failure of the University of Alabama to reclassify her position from non-exempt OCT to exempt professional;

5. All claims of Agee;

6. All claims of Griffin;

7. Claims of Reece related (1) to her employment in University Television Services and (2) to sexual harassment occurring in the Philosophy Department;

8. All claims of Carr, except her claims of sexual harassment, constructive discharge and unequal pay;

9 Claims of Morris based on any Hay Point Evaluation accruing prior to June 19, 1991;

10. All claims of Dockery that are not related to discrimination in pay;

11. Claim of McClendon arising out of denial of expanded position given to Jim Rowell;

12. Claims of Smelser related (1) to her Hay Point evaluation of October 1, 1991, and (2) to Rowell's 1988 promotion;

13. Claims of Bryce related (1) to Rowell's 1988 promotion and (2) to her 1996 discharge; and

14. All claims of Lambert not related to her discriminatory pay claims.

Further, on or before Friday, September 22, 2000, the remaining Plaintiffs shall file with the Court an amended complaint, alleging with particularity all claims remaining under 42 U.S.C. § 1983 and alleging in more detail their claims under Title VII of the Civil Rights Act and the Equal Pay Act which have not been dismissed by this order. On or before October 13, 2000, the Defendants shall file an amended answer to the amended complaint or any motion to dismiss. All discovery shall be completed on or before December 1, 2000; no extensions of discovery will be permitted, even while dispositive

motions are pending.  Any motion for summary judgment as to remaining claims shall be filed with the Clerk of Court and submitted to the Court in Chambers on or before December 15, 2000, in conformance with this Court's Appendix A Regarding Submissions.

DONE and ORDERED this 28th day of August, 2000.

H. DEAN BUTTRAM, JR.
UNITED STATES DISTRICT JUDGE